IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

LEILA CATHERINE JOHNSON,

        Plaintiff,

v.

        Case No. 1:20-cv-

        Hon.

GLOBAL LANGUAGE CENTER,

        **Jury trial demanded**

        Defendant.

# COMPLAINT
## FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

### *Introduction*

1.    This sexual harassment, sex discrimination and retaliatory discharge case under Title VII of the Civil Rights Act of 1964, as amended, 42 US.C. § 2000e *et seq.,* is brought to redress the sexual harassment and discrimination ordeal and reprisal firing of the plaintiff, Leila Catherine Johnson, by the defendant, Global Language Center ("GLC"), from employment as a GLC contract instructor at the U.S. State Department's Foreign Service Institute ("FSI"), after she suffered sexual harassment by a co-worker and sex discrimination by her supervisors, and because she reported, complained of, and opposed such misconduct against herself and her female colleagues and filed a Title VII administrative charge against her mistreatment.

2.    GLC completely failed, for more than two years, to investigate Ms. Johnson's highly credible claims of sex discrimination and harassment by her co-workers and superiors—even after she had filed an administrative charge with the State Department's Office of Civil Rights ("S/OCR"), and even after an EEOC administrative judge had found, in a

case involving one of Ms. Johnson's colleagues, that sexual harassment had infected their workplace. GLC ultimately terminated Ms. Johnson twice, once in 2017 by improperly taking a pretext from a State Department personnel staffer at face value, and a second time in 2018, on different but equally pretextual grounds, both times unable to dispute that her job performance as a language teacher was superb.

*Parties, jurisdiction and venue*

3.      Plaintiff Leila Catherine Johnson (who informally spells her first name "Leyla") is a resident of Alexandria, Virginia. Born in Lebanon in 1978, she has lived in the United States since 2000 and has been an American citizen since 2009. She holds twin bachelor's degrees in French and journalism/communications from Notre Dame University in Beirut, and has done graduate coursework in education at the University of Maryland at College Park. She is fluent in Arabic and French as well as English, and also speaks Spanish, Italian and Russian. Over a 20-year career she has been an Arabic and French instructor and curriculum developer in the governmental and private sectors in the United States, as well as a radio and print journalist and documentarian in the U.S. and abroad. As a woman she is in a class of persons protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

4.      Until her discharge complained of in this case, she worked under contract with defendant Global Language Center ("GLC") as an instructor in Arabic language and culture at the U.S. Department of State's Foreign Service Institute ("FSI"), School of Language Studies ("SLS"), Division of Near East, Central and South Asian Languages ("NEA" or "Division"), first at 4000 Arlington Boulevard, Arlington, Virginia 22204, and then at 1200 Wilson Boulevard, Arlington, Virginia 22201.

5.     Defendant Global Language Center ("GLC") is a Virginia corporation with headquarters at 1800 North Oak Street, Suite 1802, Arlington, Virginia 22209. GLC is a person within the meaning of 42 U.S.C. § 2000e(a) and an employer within the meaning of 42 U.S.C. § 2000e(b).

6.     This suit is within the Court's federal question jurisdiction under 28 U.S.C. § 1331.

7.     Venue is properly laid in this District and Division under 28 U.S.C. § 1391 and U.S. Dist. Ct. (E.D. Va.) Loc. Civ. R. 3(B) and (C), because the plaintiff's residence, the employer's headquarters, and the relevant workplace are all located here.

*Facts*

8.     Ms. Johnson was first hired by GLC in February 2016 as an instructor in Arabic language and culture under GLC's contract with the U.S. State Department's Foreign Service Institute ("FSI") in Arlington, Virginia.

9.     Ms. Johnson's performance as a language instructor at FSI was consistently exemplary. In her first 15 months at FSI, she twice won awards for excellence in teaching, and several of her students told her that she was the best teacher they had had at FSI. She also has strong endorsements from her colleagues, and was described by the Dean of the FSI School of Language Services as having high ethics in the workplace.

10.    FSI leadership held multiple workshops for all FSI staff, both direct hires and contractors, in which they specifically exhorted all staff, whether employees or contractors, to report sexual harassment and other civil rights violations directly to them. FSI Dean Wanda Nesbitt explicitly called this her "open-door policy."

11.    Shortly after Ms. Johnson began work at FSI, a fellow instructor of hers in the Arabic section, Adlan Abdel-Aziz, introduced himself and tried to start up a friendship.

Because he said he knew the Arlington area, Ms. Johnson invited him to accompany her and her children as they looked at houses to buy near FSI.

12.     Mr. Abdel-Aziz then began showing Ms. Johnson unwelcome sexual attention and said he had romantic feelings for her. His unwelcome sexual attention to her came in person at work, over the telephone, via text message, and via WhatsApp. He confided that he was unhappily married, and that he had been in a nine-year affair with his (and now her) FSI colleague Roula Hickman.

13.     On one occasion in early 2017 Mr. Abdel-Aziz asked Ms. Johnson to meet him at Arlington's Four Mile Run Park, so that Ms. Hickman would not see him.

14.     Mr. Abdel-Aziz pressured Ms. Johnson to enter a sexual relationship with him, saying that he was aware that Ms. Hickman was harassing her, at Ms. Johnson needed his protection from Ms. Hickman, and that he could "control" Ms. Hickman if Ms. Johnson would agree a sexual relationship with him. He implied that if Ms. Johnson did not submit to his unwanted sexual advances, he would not try to stop Ms. Hickman's harassment of her.

15.     Mr. Abdel-Aziz then tried to kiss Ms. Johnson. She told him politely but firmly that she was not interested and did not want to be romantically or sexually involved with him.

16.     Mr. Abdel-Aziz's response to her rebuff was to grab her and attempt an aggressive kiss, saying he "could not resist" her, but when she tried to turn away in his grip, his beard and teeth landed upon and bit into her shoulder near her neck, in the area of her bra strap.

17.     At the Arabic section workplace shortly after this encounter, Mr. Abdel-Aziz yelled derogatorily at Ms. Johnson in front of two of their colleagues, Helmi Dawood and Nada Chadli, falsely accusing Ms. Johnson of spreading rumors about him.

18.     Soon after that, Ms. Hickman, apparently suspecting that Mr. Abdel-Aziz had propositioned Ms. Johnson, began pressuring her into long conversations in an attempt to extract information about her and Mr. Abdel-Aziz. Ms. Hickman repeatedly demanded that Ms. Johnson tell her "the truth," made inappropriate intimate inquiries about Ms. Johnson's sexual life, and more than once threatened Ms. Johnson because of Ms. Hickman's position as her supervisor, her claimed personal friendship with Eugenia Nesterenko and David Mitchell, respectively the president and vice president of GLC, and David Red, the then-director of the SLS Near East languages division, and her power to have Ms. Johnson fired. Ms. Johnson found these repeated encounters extremely frightening, humiliating and demoralizing.

19.     Ms. Hickman also displayed sexual hostility toward Ms. Johnson in several forms. She made frequent derogatory comments to Ms. Johnson about her appearance and dress, suggesting that she was promiscuous, was inappropriately seeking the attention of men in the workplace, and was dependent on men for money. She once made a false complaint to GLC that Ms. Johnson's workplace attire was inappropriate. Ms. Johnson found this constant stream of insults extremely debasing, degrading, humiliating and frightening.

20.     Ms. Johnson asked for advice about Ms. Hickman's mistreatment of her from a different colleague, Tanya Matar, without realizing that Ms. Matar was a close personal friend of Ms. Hickman and that her advice would be tainted by a desire to protect Ms. Hickman.

21.     Ms. Matar said that Ms. Hickman had become jealous of Ms. Johnson because of Mr. Abdel-Aziz's attentions toward her, unwelcome though they were. Ms. Matar also claimed that she was the only Arabic section employee whom Ms. Johnson could trust.

22.     Ms. Matar advised Ms. Johnson not to file a workplace sexual harassment complaint against Mr. Abdel-Aziz, saying that she knew of other female contract instructors

who had been fired after complaining about such harassment, naming two, one called Louma and another called Ahmad.

23.     From May 2016 until Ms. Johnson was fired in May 2017, both Ms. Hickman and Ms. Matar—each for her own discriminatory reasons—harassed and bullied Ms. Johnson to force her to resign, or to have her dismissed, in retaliation for her complaint to FSI leadership of sexual harassment by Mr. Abdel-Aziz.

24.     During that entire time, and again from Ms. Johnson's re-hire in August 2017 through her second firing in August 2018, Ms. Hickman and Ms. Matar made a show of excluding and avoiding Ms. Johnson in the workplace in an effort to embarrass or humiliate her. In addition, Mr. Abdel-Aziz and Ms. Johnson's then-supervisor, Dr. Tagelsir El-Rayah, who was a personal friend of Mr. Abdel-Aziz and like him a native of Sudan, joined in the harassment and bullying of Ms. Johnson.

25.     The harassment and bullying included the above-mentioned overt hostility to Ms. Johnson in group situations by both Ms. Hickman and Ms. Matar; Ms. Hickman's asking other employees not to talk to Ms. Johnson, and her in-person disruptions of Ms. Johnson's classes, to humiliate her in front of her students; the unannounced in-class handout by Dr. El-Rayah of extra teacher evaluations of her for her students to submit; an attempt by Dr. El-Rayah to turn a report by one student of ill behavior by a fellow student into a false complaint about Ms. Johnson; Dr. El-Rayah's assignment to me of last-minute classes that were not assigned to others, then criticizing me for not performing those last-minute assignments to his satisfaction, while ignoring the performance deficiencies of her male colleagues; and unnecessary and unwelcome intrusions by Mr. Abdel-Aziz and Dr. El-Rayah into Ms. Johnson's course space on Quizlet, an online teaching system she was using for her students' enrichment, in order to disrupt their experience of her courses.

26.     Ms. Hickman was motivated both (a) by a desire to retaliate against Ms. Johnson for exposing Mr. Abdel-Aziz's sexual harassment, and (b) by a sexually discriminatory animus against Ms. Johnson.

27.     Ms. Matar was motivated both (a) by a desire to retaliate against Ms. Johnson for exposing Mr. Abdel-Aziz's sexual harassment, and (b) by a sexually discriminatory animus against other professional women, especially but not only those of Lebanese origin.

28.     Ms. Matar called women from Lebanon "whores" and "sluts," specifically insinuating that two women of Lebanese origin at FSI had obtained positions, promotions, or advantages by sleeping with their superiors. She often insinuated that other women at FSI had done the same.

29.     Ms. Matar made a practice of treating most other women at FSI coldly, in contrast to men, whom she treated with sometimes extravagant solicitude. At the same time, she referred to many relationships at the office in sexualized terms, claiming that various male instructors were "hitting on" her or other women. She even shared with Ms. Johnson that she was "flirting" with one of her direct subordinates, a man whose wife was a student at FSI, and disparaged the wife with an obscenity when Ms. Johnson urged that she stop the flirting. And although she claimed that she was not on speaking terms with Ms. Hickman, Ms. Johnson saw them walking together more than once.

30.     Mr. Abdel-Aziz and Dr. El-Rayah were motivated by a desire to retaliate against Ms. Johnson for rebuffing Mr. Abdel-Aziz's sexual advances.

31.     In early 2017, Ms. Johnson went to see Dean Nesbitt under her "open door policy," and specifically reported to her the sexual harassment and discrimination she was experiencing. She explicitly described Mr. Abdel-Aziz's unwelcome sexual advances upon her, including what he had done to her physically at Four Mile Run Park.

32.     At Dean Nesbitt's suggestion, Ms. Johnson then went to see Ann Keller-Lally, who was then director of the Near East and Central Asian Languages division in which Ms. Johnson worked. Ms. Keller-Lally heard Ms. Johnson out, and offered to intercede with Ms. Hickman.

33.     With Ms. Keller-Lally's agreement, Ms. Johnson first attempted to address Ms. Hickman directly about her behavior. This she did in an e-mail to Ms. Hickman on April 25, 2017. The e-mail said, in part, "For months now, I have suffered because of an issue related to you [and] Mr. Abdel-Aziz[.]" Ms. Johnson later showed Ms. Keller-Lally this e-mail, and Ms. Keller-Lally followed up with her several times to see if she had gotten a response. No response ever came.

34.     As a result of the sexual harassment and other mistreatment described in the preceding paragraphs, Ms. Johnson experienced chronic sleeplessness (with only four to five hours of interrupted sleep each night), continuing headaches, feelings of depression, periods of extreme lack of energy, general listlessness, difficulty breathing, and a high heart rate (up to 160 beats per minute, sometimes reaching 207, without exertion). Her menstruation ceased for months, and when it resumed remained intermittent.

35.     Ms. Johnson made frequent visits to physicians, and underwent elaborate diagnostics including electrocardiograms and CAT scans. She was advised by her physicians that her medical problems were induced by severe stress.

36.     Meanwhile, Ms. Johnson was witnessing a broader pattern of discrimination against and exploitation of women in the Arabic language department at FSI, including the assigning of women to heavier teaching loads and more strenuous responsibilities than men.

37.     Women instructors at FSI typically had a full workload, while men often merely came in to record their presence and then disappeared. Most employees were on the

substitute rotation, an easier assignment than full-time teaching because it does not require daily lesson plans and instruction. Ms. Johnson was often assigned a regular class at the last minute instead of a substitute rotation. She did not see this happen to her male FSI instructor colleagues.

38.    Moreover, men were more often given merit awards than women, sometimes for work that their female co-workers had done.

39.    In 2017 this injustice was visited on Ms. Johnson specifically. She and one of her students, Daniella Gareton, spent many hours on the SLS Quizlet mobile application to improve instruction and make it more accessible to students. After the two women had done most of the work, and students were already successfully taking advantage of the app as improved, Ms. Johnson was told that Mr. Abdel-Aziz had been assigned to work on the project with them. This occurred months after he had assaulted Ms. Johnson.

40.    It is unclear why this assignment was made or who made it, but Mr. Abdel-Aziz's involvement was unnecessary, both because he was not technically competent and because the project was nearing completion. Ms. Johnson was nevertheless forced to spend hours teaching Mr. Abdel-Aziz, her harasser and assailant, how to use the app. The crowning injustice of the episode was that FSI ultimately gave Mr. Abdel-Aziz, but not Ms. Johnson or Ms. Gareton, an award for the success of the Quizlet project.

41.    FSI also failed to enforce its own disciplinary policies equally as to men and women. For instance, it declined to terminate the following male Arabic language instructors despite performance issues more serious than any it could have had with Ms. Johnson:  (a) Abdel-Razzak Al-Dobhani, despite complaints from students that more than once he fell asleep while teaching; (b) Alon Lanir, despite complaints from students and co-workers about classroom behavior and failing to meet deadlines; and (c) Michael Abd-Elmessig, despite

student and teacher complaints about his behavior and inappropriate remarks. Each man was placed on a performance improvement plan. No such process was ever accorded Ms. Johnson.

42.   At an SLS instructors' "town hall" meeting on May 2, 2017, Ms. Johnson spoke out against sex discrimination at the workplace, and against sexual and other workplace harassment that she had personally experienced at the hands of a fellow worker whom she did not publicly name. Ms. Johnson had been assured before the meeting, by both Ms. Keller-Lally and Mr. Petrosian, that the meeting would be a safe space to speak up, and both of them were present when she did.

43.   When Ms. Johnson spoke up at the May 2nd meeting, she specifically stated that women and men were treated differently in the Arabic section, in that women were given heavier workloads and busier schedules; that there were male-dominated ethnic cliques in the section, resulting in favoritism from men to other men in assignments and other tangible and intangible benefits; and that sexual harassers had been working in the section for many years without any punishment, and that supervisors used their positions to retaliate against people who reported or opposed sexual harassment or sex discrimination.

44.   Ms. Johnson's contract was terminated on May 17, 2017, only days after the "town hall" meeting described in Paragraph 42 above. She was notified of the termination in a telephone call from GLC around 9 p.m. that night and told not to return to work. GLC said that it was unclear about the reasons, but said that the instruction did not come from Ms. Johnson's supervisors.

45.   Ms. Johnson's firing was a complete surprise to Dean Nesbitt, as well as to Ms. Keller-Lally and her then-deputy Mr. Petrosian.

46.     The day after the firing, May 18, 2017, Ms. Johnson wrote to all three individuals named in the preceding paragraph, as well as to Dr. El-Rayah, Atef Nazir, and Walid Abu-Ulbah, describing the telephone call and asking what had happened.

47.     That same day Ms. Johnson received a reply from Dean Nesbitt, saying, "Dear Leyla--I do not know what happened. All I can tell you is that we were informed that you would not be returning and have been asked to refer you to your company."

48.     Dean Nesbitt's reply continued, "You did a fantastic job as an instructor. Please know that your work is recognized and appreciated. I am very sorry that I cannot do anything about this situation." She signed the e-mail, "Best wishes, Wanda Nesbitt."

49.     Shortly after Ms. Johnson's firing, a group of 12 Arabic section instructors wrote Dean Nesbitt in protest of the firing, expressing consternation and dismay that someone as capable and dedicated as she would be terminated.

50.     Their letter read, in part: "On May 18, 2017, we . . . were shocked and surprised when we heard of our colleague Leyla Johnson's sudden dismissal. . . . [W]e tried to get clarification from the section administration and staff regarding the reason behind her firing. Much to our surprise, our section supervisors said that no one is aware of the decision and that they were surprised to find an e-mail in the morning of that day terminating Leyla's contract[;] neither reason nor justification was given."

51.     The teacher group letter continued: "Leyla was a great teacher, a respectable colleague and an honest friend of everybody in the section. We witnessed her absolute dedication to her job and students. She was always sacrificing her own time, [giving up] lunch breaks to give instructional support to her students . . . answering their questions at any time and anywhere at FSI. . . . Her students adored her . . . [she] is disciplined, punctual, and a devoted professional. By losing her, FSI is losing a very capable and talented teacher. . . . We

deserve to know the truth . . . of her firing and whether that decision was taken . . . due to the fact of her speaking out in a staff meeting . . ."

52.     In June 2017, Ms. Johnson received an award from FSI for excellence in teaching—ironically given to her in absentia, because she had been fired in May.

53.     GLC later informed Ms. Johnson that the State Department had received an anonymous complaint about her and had decided to dismiss her on the strength of that complaint alone.

54.     The firing, Ms. Johnson learned, had been informally engineered by Roula Hickman, without the knowledge of her FSI superiors, in a direct intervention with a contract officer at the State Department, Jonathan Elsasser, to whom she made an anonymous complaint about "bullying" from Ms. Johnson, based on Ms. Johnson's April 25th e-mail imploring Ms. Hickman to stop bullying *her*.

55.     Mr. Elsasser later admitted, during an EEO investigation by S/OCR, that he had seen and relied on Ms. Johnson's April 25th e-mail, and on the caller's characterization thereof, in deciding to cut off Ms. Johnson's employment at FSI and so inform GLC. He gave the S/OCR investigator no other reason.

56.     Mr. Elsasser gave no other thought to the matter, and did no further investigation of whether termination of Ms. Johnson was warranted, beyond the anonymous call and the April 25th e-mail.

57.     If Mr. Elsasser had performed an honest and thorough inquiry, he would have found the situation drastically different from what the anonymous caller, Ms. Hickman, had represented to him, and would or should have recognized that firing Ms. Johnson was unwarranted.

58.    GLC, in the person of vice president David Mitchell, simply took Mr. Elsasser's position at face value and immediately fired Ms. Johnson without any question, inquiry, doubt, pushback or resistance of any kind.

59.    If Mr. Mitchell or anyone at GLC had performed an honest and thorough inquiry, he or they would have found the situation drastically different from what Mr. Elsasser represented to them, and would or should have recognized that firing Ms. Johnson was unwarranted.

60.    Not long after Ms. Johnson's termination, Mr. Petrosian reached out to her to let her know that he and Ms. Keller-Lally considered her teaching to be of high quality and that she had done nothing to deserve dismissal, that they were working to get her re-hired, and that she should re-apply immediately.

61.    Meanwhile, Ms. Johnson filed an EEO complaint with the U.S. State Department's Office of Civil Rights ("S/OCR") in June 2017, alleging that her May 2017 firing was part of a pattern of retaliation by Ms. Hickman for her complaining of sexual harassment by Mr. Abdel-Aziz, and that his unwanted sexual advances, Ms. Hickman's and Ms. Matar's retaliatory bullying and that of Dr. El-Rayah and Mr. Abdel-Aziz himself, and the State Department's failure to investigate or redress these complaints when reported, constituted sex discrimination and made for a hostile work environment.

62.    In August 2017, while her EEO complaint was pending, Ms. Johnson was re-hired by GLC, as a result of the interventions on her behalf described in Paragraph 60 above.

63.    Ms. Johnson returned to FSI on August 8, 2017, and resumed teaching, although with trepidation about further required interactions with Ms. Matar, Ms. Hickman, Mr. Abdel-Aziz and Dr. El-Rayah.

64.     When coming to work in the mornings, Ms. Johnson often passed by the office of Mr. Petrosian. She repeatedly told him of her apprehension about further harassment and retaliation, her worry about whether it was safe to voice her concerns and whether she would be fired again, and the stress this placed on her. Mr. Petrosian told her repeatedly that she should feel comfortable coming to FSI upper management with her concerns.

65.     After her re-hire, Ms. Johnson explained to Iouri Bairatchnyi, who by then was in place as GLC's on-site program manager at FSI, and in that capacity was her GLC supervisor, the circumstances of her sexual harassment by Mr. Abdel-Aziz, her rebuff of his unwelcome sexual advances, her subsequent mistreatment by him and by Ms. Matar, Ms. Hickman, and Dr. El-Rayah, her evidence that her first firing was retaliatory, and her need to avoid all four individuals after her re-hire.

66.     Shortly after Ms. Johnson resumed teaching at FSI, Ms. Keller-Lally and Mr. Petrosian took her to the eighth floor of the FSI building, away from her usual workplace, for a private conversation, in which they expressed their concern and regret that she had been fired and encouraged her to come to them directly if she ever sensed any further threat of retaliatory action. By this time, as described above, both Ms. Keller-Lally and Mr. Petrosian knew about Ms. Johnson's ordeal in detail, including the sexual assault by Mr. Abdel-Aziz and the workplace harassment by Ms. Hickman, Ms. Matar, Dr. El-Rayah and Mr. Abdel-Aziz himself.

67.     After her re-hire, Ms. Johnson learned from an intermediary that Ms. Matar intensely resented her filing of an EEO complaint about Mr. Abdel-Aziz despite Ms. Matar's attempt to keep her from doing so, thus confirming that Ms. Matar's motives in harassing her were retaliatory.

68.     In a private conversation in late 2017, Ms. Keller-Lally surprised Ms. Johnson by asking about Ms. Matar. Without knowing why Ms. Keller-Lally was asking, Ms. Johnson explained how dismissively and discouragingly Ms. Matar had responded to her sexual harassment concerns.

69.     During 2017 and 2018, Ms. Johnson witnessed the continuation of the pattern of sexual harassment and degradation of women in the Arabic section, even though the State Department had appointed an EEO official and held a series of workshops and information sessions in reaction to widespread publicity surrounding the #MeToo movement and its concerns.

70.     One such workshop, not the first of the series, was held on or about November 29, 2017, for all SLS staff and faculty. Ms. Johnson attended, as did Ms. Keller-Lally. Staff from the U.S. EEOC were there. Several presenters, all African-American women, described various forms of prohibited harassment and other discriminatory behavior, and urged all staff to report any complaints of harassment, bullying, or other mistreatment.

71.     Ms. Johnson spoke up during this workshop, holding in her hand an article dated November 16, 2017, from the blog "Diplopundit," an electronic publication about the internal workings of the State Department from the viewpoint of its employees. The article reprinted a letter from a Foreign Service officer lamenting the Department's inaction on sexual harassment claims.

72.     Ms. Johnson voiced her concern that staff members were being urged to come forward with their complaints, but that she had done precisely that, less than a year earlier, after being sexually assaulted by a male co-worker, and had been fired for complaining. She further expressed her concern that sexual harassment and discrimination complaints lodged

with S/OCR were consigned to a years-long backlog, and that there was no S/OCR or other EEO representative on site at SLS.

73.     Immediately after the workshop ended, a fellow instructor of Ms. Johnson's in the Arabic section, Nariman Rizk, approached Ms. Johnson to say that she had been sexually attacked in her office by a male colleague. Ms. Johnson was shocked to learn that Ms. Rizk's attacker and her own were the same person, Mr. Abdel-Aziz.

74.     Ms. Johnson asked Ms. Rizk if she had reported the attack to FSI management, and Ms. Rizk confirmed that she had reported it both to Mr. Petrosian and to Ms. Keller-Lally. Ms. Rizk also shared that Nada Chadli, another colleague, had seen her shaking and in tears immediately after the attack, and had urged Ms. Rizk to go up and report it.

75.     Ms. Johnson went up on her own to Ms. Keller-Lally and Mr. Petrosian, described Ms. Rizk's account to them, and inquired why the State Department's Office of Civil Rights had not yet reached out to Ms. Rizk. Ms. Keller-Lally and Mr. Petrosian admitted that neither of them had yet reported the attack on Ms. Rizk.

76.     Ms. Johnson then described to Mr. Petrosian and Ms. Keller-Lally the details of her own harassment by Mr. Abdel-Aziz, and at the same time urged that Ms. Rizk's complaint be addressed. Ms. Johnson also reported the attack on Ms. Rizk directly to S/OCR.

77.     In January 2018, the U.S. Equal Employment Opportunity Commission's Office of Federal Operations ("OFO") issued a decision on administrative appeal in *Blanca B. v. U.S. Department of State*, finding that one or more men in the SLS Arabic section had committed sex discrimination and sexual harassment of a female colleague. The OFO remedial order required that the Department post prominently at the workplace a notice that it had been found liable for such discrimination. Ms. Johnson and her fellow instructors saw that notice.

78.     Shortly after the OFO order just described, an investigative exposé appeared in "Diplopundit," giving previously unpublicized details of the *Blanca B.* case, including the key detail that one of Ms. B.'s principal harassers in the Arabic section was of Sudanese national origin. Ms. Johnson knew of only two such individuals who were in the section at that time: Dr. El-Rayah, who was still Ms. Johnson's supervisor, and Mr. Abdel-Aziz himself.

79.     As soon as she saw this "Diplopundit" article, Ms. Johnson, keenly aware of her own prior sexual harassment experience and now even more fearful that it would recur, e-mailed her FSI superiors that the article had implied that the harasser in the *Blanca B.* case was still in the Arabic section. She specifically asked whether and why this was so. Her query went unanswered.

80.     Ms. Johnson did know, however, that Dr. El-Rayah often leered lewdly at her, and that she did not feel safe working around him, both for that reason and because he was quite open about his close friendships with Mr. Abdel-Aziz and Ms. Hickman.

81.     Sometime after her re-hire in 2017, Ms. Johnson e-mailed an SLS supervisor named Atef Nazir, describing her experience of sexual harassment and sex discrimination, reporting her fear of retaliation given the behavior of Mr. Abdel-Aziz and others after her re-hire, and asking Mr. Nazir to switch her from Dr. El-Rayah's instruction team to his own. Mr. Nazir may have relayed, or said he relayed, Ms. Johnson's request up the chain of authority, but in any event the requested change of team never happened.

82.     Then, in August 2018, Ms. Johnson was informed, by a colleague who had received the news directly from Ms. Matar, that Ms. Matar was about to be made Ms. Johnson's supervisor in the Near Eastern language division.

83.    In an e-mail dated August 7, 2018, Ms. Johnson protested to Ms. Keller-Lally, Mr. Petrosian, and Dean Nesbitt that this decision posed an intolerable threat of further retaliation given Ms. Matar's previous malign and oppressive behavior.

84.    Ms. Johnson forwarded this e-mail to Mr. Bairatchnyi on the morning of August 9, 2018.

85.    GLC's response was to fire Ms. Johnson just after 12 noon that same day, August 9th, via e-mail from GLC vice president David Mitchell. Mr. Bairatchnyi then instructed Ms. Johnson to clear out her personal effects and leave the office, but was unable to give Ms. Johnson any reason for the sudden termination.

86.    Ms. Johnson learned later that GLC had fired her on the asserted grounds (a) that her sending the August 7 e-mail first to her supervisors at FSI was improper, and (b) that her scheduled leave during July 2018 was unauthorized.

87.    Both these pretexts were false. In communicating directly with her superiors at FSI, Ms. Johnson was doing as they had told her to do, and in forwarding the August 7 e-mail to Mr. Bairatchnyi she was keeping GLC informed; and the July 2018 leave in question, part paid and part unpaid, was requested and approved in writing well in advance by Ms. Johnson's supervisor at the time, Denusia Libby.

88.    The leave just described, a trip to Ms. Johnson's native Lebanon, was planned partly to visit close relatives, including a last visit with a dying aunt, and partly to take a badly needed break from the adversities described in this Complaint. Ms. Libby knew of both purposes and had no objection to either.

89.    Moreover, when Ms. Johnson returned from her July 2018 leave, she learned that her FSI position and GLC contract had been formally renewed, with no questions as to the leave she had just taken.

90.     Ms. Johnson has looked for employment with diligence since her 2018 termination by GLC. She has been assisting with her spouse's business, first in an unpaid capacity and then with modest remuneration, while applying for multiple jobs in her field, including attempts to work at FSI.

91.     Sometime after Ms. Johnson was fired, she learned that after Ms. Matar became a supervisor, she changed the qualifications for instructors in the Arabic section to allow only people with Jordanian and Palestinian backgrounds to apply for positions which previously were open to anyone from the Levant. This restriction, which made Ms. Johnson ineligible to apply, had no linguistic, educational, or other legitimate justification. Ms. Matar's act was a retaliatory attempt to disqualify Ms. Johnson from returning to a position like the one from which she had been unlawfully ousted.

92.     On October 30, 2018, Ms. Johnson filed an administrative charge of sexual harassment, sex discrimination and retaliation against GLC, alleging that her August 2018 firing was a new and separate act of discrimination and retaliation.

93.     Ms. Johnson received notice of her right to file this suit on March 6, 2020. This suit is filed within 90 days thereafter, and is timely under 42 U.S.C. § 2000e-5(f)(1).

94.     Ms. Johnson's ordeal described in this Complaint resulted in medical sequelae, particularly heart problems, from the time the harassment described herein began and continuing to the time of this filing. Specifically, she has suffered chest pains, increased heart rate (often over 168 beats per minute, sometimes reaching 207, without exertion), and shortness of breath. She had numerous diagnostic tests done by a cardiologist in April 2017, including stress and nuclear tests. She is now on prescription "beta blockers" to control her heart issues. She has also suffered, and continues to the present day to suffer, feelings of

depression, headaches, periods of extreme lack of energy, and general listlessness. And for months her menstrual period was absent, and when it resumed it was intermittent.

95.    Ms. Johnson also still suffers, and will continue to suffer, the humiliation and emotional damage inflicted on her by wrongs that Title VII was enacted to redress. She was terminated two different times, without warning or explanation, and escorted out of the building, her badge revoked as if she were a criminal in her adopted country. To this day she has never received a proper explanation of either of her terminations.

*Count I: Sexual harassment in violation of Title VII*

96.    The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

97.    The unwelcome and unwanted sexual advances pressed upon Ms. Johnson by Mr. Abdel-Aziz constituted sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2.

98.    The acts of Mr. Abdel-Aziz, during and after his unwanted and unwelcome advances, and the acts of Ms. Johnson's co-workers and superiors, as described in this Complaint, were sufficiently severe and pervasive to alter the terms, conditions and privileges of Ms. Johnson's employment, and to create an abusive, intimidating hostile and offensive working environment for her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2.

99.    The co-workers and superiors described herein as having created this environment for Ms. Johnson were acting within the scope of their employment, and they had the power to take, and did take, tangible employment actions adverse to Ms. Johnson.

100.   By terminating Ms. Johnson's employment on May 17, 2017, while failing to investigate, inquire, doubt or question the supposed basis for Mr. Elsasser's decision in May

2017 that Ms. Johnson should be terminated—a decision that GLC knew or should have known was baseless and wildly contrary to her demonstrated classroom performance, teaching ability, and professionalism, and realized or should have realized was a pretext for the harassment retaliation of which Ms. Johnson had already complained—GLC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, as recognized in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998), and explained at 29 C.F.R. § 1604.11(d) (describing employer's duty to take "immediate and appropriate corrective action" against sexual harassment of which it knew or should have known).

101.    By terminating Ms. Johnson's employment on August 9, 2018, while failing to investigate or redress the sexual harassment and hostile work environment that Ms. Johnson reported to Mr. Bairatchnyi, and of which Mr. Mitchell knew because of Ms. Johnson's earlier EEO investigation, GLC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, as recognized in *Faragher v. City of Boca Raton,* 524 U.S. 775 (1998), and *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998), and explained at 29 C.F.R. § 1604.11(d) (describing employer's duty to take "immediate and appropriate corrective action" against sexual harassment of which it knew or should have known).

102.    GLC's acts and omissions in violation of Title VII directly and proximately resulted in loss of wages, as well as immediate and ongoing emotional distress, severe and lasting emotional harms, and enduring loss of quality of life, to Ms. Johnson, and required her to engage legal counsel in an effort to discover what really happened and to seek relief for the wrongs done to her.

### *Count II: Sex discrimination in violation of Title VII*

103.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

104.   GLC knew or should have known of the mistreatment of Ms. Johnson described in this Complaint, since she reported it to GLC on multiple occasions, including after GLC hired and put in place an on-site program manager for its contractors at FSI, Iouri Bairatchnyi.

105.   By allowing Ms. Johnson to be treated differently and less favorably than similarly situated male instructors, in the manner, during the time periods, and on the motivations alleged in this Complaint, and by terminating her on August 9, 2018, without a legitimate non-discriminatory reason, and on a pretext for, and in willful disregard of her complaints of, sex discrimination as described herein, GLC violated Ms. Johnson's right against sex discrimination protected by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

106.   GLC's acts and omissions in violation of Title VII directly and proximately resulted in loss of wages, as well as immediate and ongoing physical ailments and emotional distress, severe and lasting physical and emotional harms, and enduring loss of quality of life, to Ms. Johnson, and required her to engage legal counsel in an effort to discover what really happened and to seek relief for the wrongs done to her.

*Count III: Retaliation in violation of Title VII*

107.   The preceding allegations of this Complaint are incorporated herein in their entirety by reference.

108.   In dismissing Ms. Johnson from employment on August 9, 2018, GLC retaliated against her for protected activity, to wit, complaining about past sex discrimination and sexual harassment by her co-workers and superiors, opposing discriminatory practices that Title VII

makes unlawful, and protesting the likely continuation of such sex discrimination, sexual harassment, and hostile work environment with the impending installation, as Ms. Johnson's new supervisor, of someone—Ms. Matar—against whom she had a pending Title VII complaint. These acts and omissions by GLC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

109.    In changing the job description for SLS Arabic instructors, as alleged above, to preclude anyone of Ms. Johnson's national origin from applying for such positions in the future, Ms. Matar intended to engage, and did engage, in further retaliation for Ms. Johnson's protected activity as described above, and unlawfully prevented Ms. Johnson from being re-hired at FSI.

110.    In allowing and/or failing to protest or investigate the bizarre and unjustified change of job description cited in the preceding paragraph, GLC ratified and/or cooperated in, and therefore effectively committed, further retaliation for Ms. Johnson's protected activity as described above, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2.

111.    GLC's acts and omissions in violation of Title VII directly and proximately resulted in loss of wages, as well as immediate and ongoing physical ailments and emotional distress, severe and lasting physical and emotional harms, and enduring loss of quality of life, to Ms. Johnson, and required her to engage legal counsel in an effort to seek relief.

WHEREFORE, plaintiff Leila Catherine Johnson respectfully prays for the following relief:

1.    A declaration that the acts and omissions of GLC described in each Count of this Complaint constituted violations of Title VII.

2.      A permanent injunction prohibiting GLC, its officers, agents, employees, and successors from engaging in the discriminatory employment practices complained of herein, and requiring GLC to reform itself, under this Court's supervision, to prevent their future recurrence.

3.      An award of back pay, front pay, and other job benefits to Ms. Johnson sufficient to redress fully the economic harms that she has suffered.

4.      An award of compensatory damages to Ms. Johnson sufficient to redress the physical, emotional and quality-of-life harms that she has suffered.

5.      An award of punitive damages sufficient to pose an effective deterrent to future Title VII violations by GLC.

6.      An award of Ms. Johnson's reasonable attorneys' fees and costs of suit.

7.      An award of any other and further relief necessary to prevent future sex discrimination, sexual harassment and retaliation by GLC, and to ensure that sex discrimination, sexual harassment and retaliation complaints are fully and fairly investigated and redressed; and

8.      An award of any other and further relief that this Court may deem just and proper.

### *Jury demand*

Plaintiffs demand trial by jury on all counts and allegations of the Complaint.

Respectfully submitted,

_____
Stephen B. Pershing
D.C. Bar No. 482580
Pershing Law PLLC

1416 E Street, N.E.
Washington, D.C. 20002
(202) 642-1431 (o/m)
steve@pershinglaw.us

*Counsel for plaintiff Leila Catherine Johnson*

Dated:  June 4, 2020